UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CARAVEL/WOODWIND CHARTERS,
INC., a corporation; and ST.
PAUL FIRE & MARINE INSURANCE
CO., a corporation

       Plaintiffs,

   v.

TAHOE KEYS MARINA, LLC d.b.a.
TAHOE KEYS MARINA, a
California limited liability
company; RAY CARREAU, an
individual; RICHARD HORTON, an
individual; TAHOE KEYS
PROPERTY OWNERS' ASSOCIATION,
a corporation; and TAHOE KEYS
BEACH AND HARBOR ASSOCIATION,
INC., a corporation,

       Defendants.

_____/

NO. CIV. S-05-1435 FCD KJM

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

----oo0oo----

    This case arises out of the sinking and subsequent damage to
a vessel, the Safari Rose, which occurred when it made contact
with a concrete cap in defendant's navigational channel while

1

making its way out to Lake Tahoe.  On July 15, 2005, plaintiffs Caravel/Woodwind Charters, Inc. ("Caravel") and St. Paul Fire & Marine Insurance Co. ("St. Paul") (collectively "plaintiffs") filed a complaint in admiralty against all defendants. Subsequently, all defendants, except defendant Tahoe Keys Marina LLC ("TKM" or "defendant"), were dismissed from this action.[1] Plaintiffs allege that defendant negligently breached their duties to maintain the channel for navigation and/or to warn and inform potential users of all hazards to navigation.[2]  Defendant asserts that it is not responsible for the sinking of Caravel's vessel and alternatively, that plaintiffs' claim for damages is limited.

The court held a five day bench trial from August 28 through September 5, 2007.  Considering the evidence presented therein and the parties' written submissions thereafter, the court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACT**[3]

1.     On July 17, 2003, the Safari Rose, a passenger cruise vessel on Lake Tahoe, collided with a piece of concrete on the

---

[1]     All cross-claims in this action were also dismissed pursuant to a Stipulation and Order, filed February 2, 2006. [Docket # 43].

[2]     Plaintiffs also alleged that defendant breached an oral promise that the entire channel had a minimum depth of nine feet. However, neither plaintiffs nor defendant address this breach of contract theory in their proposed findings of fact and conclusions of law.  As such, the court deems this claim waived and only addresses the negligence theory of relief.

[3]     To the extent that any of the court's findings of fact may be considered conclusions of law or vice versa, they are to be considered as such.

bottom of a channel connecting Lake Tahoe to defendant's marina. The striking opened a hole in the Safari Rose's hull, and the boat took on water.  After realizing the boat was taking on water, the captain of the Safari Rose decided to intentionally ground the vessel in about six feet of water.  The vessel sustained damage.  (Pretrial Order [Docket # 93], filed July 16, 2007, at 1).

2.    The Safari Rose was and is owned by plaintiff Caravel and was insured against damage by plaintiff St. Paul.  (Id.)

3.    Steve Dunham ("Dunham") is the principal and joint owner of Caravel.  (TT I:22:4-6).[4]

4.    Caravel is a tour boat company that started conducting business in 1978 with one boat.  (TT I:22:7-14).  It now has four boats, one of which is the Safari Rose.  (TT I:22:8-9, 24-25).

5.    The Safari Rose is a wood hull, 95 ton motor yacht constructed in 1958.  (TX 33; TT I:128:6-7).

6.    It was purchased by Caravel at Seattle, Washington in mid-2002 for $260,000.  (TT I:23:15-17; TX 33; Pretrial Order at 2).

7.    The Safari Rose is approximately 80 feet long and 20 feet wide.  (TT I:23:15-17).

8.    The Safari Rose was equipped with stabilizers, moveable fins mounted on the bottom of the boat's hull to reduce roll in choppy water and improve comfort on the boat.  (TT I:136:10-25).

---

[4]    All citations to "TT ___" are to the Trial Transcript of the bench trial.  Citations to the transcript refer to the transcript volume as a Roman numeral (there are five volumes, one for each trial day), then page and line numbers.  All citations infra to "TX ___" are to the exhibits admitted into evidence during the trial.

3

The stabilizers were located about halfway between the front and back of the boat and extended to a depth of approximately 4 feet below the surface of the water. (TT I:56:16-22).

9.    The Safari Rose has two propellers, located about eight to ten inches inboard of the stabilizer fins. (TT I:54:25-55:2; I:87:21-23). There are two rudders directly behind the propeller. (TT I:88:1).

10.    Defendant TKM at all material times has controlled and maintained the navigational channel, known as the East Channel (the "channel"). (Pretrial Order at 1). The channel is private property. (TT II:134:12).

11.    Ray Carreau ("Carreau") and Richard Horton ("Horton") are each 50% partners in TKM. (TT IV:80:4-8).

12.    Steve Buttling, TKM's marina manager from 1990-2005, was responsible for the maintenance of the marina, including the channel. (TT III:6:14-24).

13.    The channel consists of an inner part bordered on either side by parallel steel bulkheads rising several feet above the water level. (Pretrial Order at 1). The inner part begins at the marina, where vessels berth at docks, and extends to the edge of Lake Tahoe. (Id.) The channel connects the TKM with Lake Tahoe. (Id.)

14.    The inner channel is about 650 feet long and 80 feet wide. (Id.)

15.    The inner channel is the only way for boats to enter or leave TKM by water. (Id.)

16.     The outer part of the channel is not bordered by anything other than buoys that are anchored to cement blocks, meant to define where the channel has been dredged for navigation.  (Id.)

17.     The concrete piece which came in contact with the Safari Rose was located at about the halfway point of the East Channel, up against the bulkhead on the east side.  (Id.)

18.     The channel bottom is in the shape of a "U" or a "V"; the bed of the channel is deepest in the center.  (TT IV:68:18-22). The gradient of the bed from the bulkheads to the center of the channel is gradual.  (TT III:88:11-12).

19.     TKM advised boaters to remain in the center or middle of the channel when transiting.  (TT III:56:25-57:19).

20.     The water at TKM, including the East Channel, is greenish and murky, with clarity further reduced by algae and milfoil. (TT I:35:2-14; III:94:22-25).  Looking straight down over the water, visibility is limited to about a foot from the surface of the water.  (TT I:35:16-19).  From the bow of the boat, looking forward at the water from an angle other than straight down, one cannot see below the surface of the water.  (TT I:35:20-23).

21.     With the water level as it was in July 2003, the bottom of the channel was not visible.  (TT III:116:17-19).

22.     An electric line topped with concrete was placed on the bottom of the channel before 1978.  Part of the concrete covering the electric line was removed in 1978, but a section of the concrete, stretching 10 to 15 feet from the east bulkhead, was not removed because it provided support to the bulkhead (the "concrete cap").  (TT IV:67:14-68:17).

23.     The concrete cap sloped downward towards the center of the channel.  (TT IV:114:8-9).

24.     TKM was aware of the existence of the concrete cap prior to July 17, 2003.  (Pretrial Order at 2).

25.     TKM never marked the concrete as a hazard.  (TT IV:70:2-4).  Carreau did not think the concrete cap was a concern because there had been no reports of boats hitting the cap after 1978. (TT IV:70:15-17; 85:21-23).

26.     When he discovered the concrete cap in 1990, Buttling believed that it was a safety hazard to vessels.  (TT III:8:2-25).

27.     Buttling frequently heard from the workers at the boat rental that rental boats had hit something in the channel and destroyed the propellers on the boats.  (TT III:28:19-21). Buttling presumed it was the concrete cap.  (TT III:29:14-16).

28.     After Caravel purchased the Safari Rose and while repairs and upgrades were ongoing, Caravel approached TKM about leasing berth space as a base of operations for the boat's commercial passenger pleasure cruises on Lake Tahoe.  (Pretrial Order at 2). Caravel and TKM negotiated toward a written lease involving a $2000 monthly rent and a percentage of the boat' income to be paid to TKM.  (Id.)  The lease was not signed.  (Id.)

29.     The Safari Rose arrived by road at Lake Tahoe in June 2003 and was put into the water at its berth at TKM on June 27, 2003.  (Id.)

30.     Caravel began paying monthly rent to TKM on June 27, 2003.  (Id.)

31.     After the boat arrived at TKM and before the boat was put into the water, Buttling recommended to Dunham that the stabilizers should not be reinstalled on the Safari Rise because it was another protrusion below the hull.  (TT III:58:7-11).

32.     However, other boats on Lake Tahoe have stabilizers and Buttling was not aware of any such boats having problems.  (TT III:58:22-59:2).

33.     Carreau never told anyone affiliated with the Safari Rose that it could not operate at TKM unless the stabilizer fins were taken off.  (TT IV:82:9-12).

34.     Prior to the boat's operation at TKM, Dunham asked Carreau and Buttling whether there was sufficient water in the channel to operate the Safari Rose and whether there was anything he needed to know about the channel.  In response, both replied that there was about nine feet of water in the channel.  (TT I:139:6-18).

35.     Dunham was never given any warnings that there was a concrete cap in the channel.  (TT I:34:16-18).

36.     After the Safari Rose was launched at TKM and began operating cruises in early July 2003, Captain David Marion ("Marion") served as the boat's captain.  (TT III:108:23-109:10).

37.     Marion has been a Coast Guard licensed captain for 32 years.  (TT III:103:11-15).  He has thousands of hours of experience operating sailboats and power boats.  (TT III:104:19-23).  He has more than 20 years of experiences as a professional captain at Lake Tahoe.  (TT III:105:1-7).

38.     Prior to operating the Safari Rose, Marion had navigated 40-54 foot boats that drafted up to four feet through the channel on numerous occasions.  (TT III:109:16-20).

39.     Prior to the July 17, 2003, Marion navigated the Safari Rose through the East Channel about 15 to 16 times.  (TT III:178:5-8).  During these times, Marion kept the Safari Rose toward the middle of the channel.  (TT III:178:9-15).

40.     Buttling never told Dunham or Marion how far off the centerline of the channel the Safari Rose could safely go or that the stabilizer fins might hit the concrete cap.  (TT III:26:19-27:15).

41.     On July 17, 2003, the Safari Rose entered the East Channel with approximately 20 passengers.  (TT III:117:17-118:13).

42.     The navigational crew consisted of Marion and Karen File ("File"), the senior deckhand.  (TT III:118:15-25).

43.     There was traffic both in and out of the channel, with one or two boats ahead of the Safari Rose heading out of the channel and three boats coming into the channel.  (TT III:119:18-120:1).

44.     When Marion saw the third incoming boat, a 28-30 foot sailboat, he gradually steered the Safari Rose to the right to allow the incoming boat to safely pass.  (TT III:121:12-20).  This moved the Safari Rose to a distance of roughly 10 feet from the east bulkhead of the East Channel, leaving the port side of the boat about 5-10 feet off the channel's center line.  This left about 10-15 feet between the Safari Rose and the sailboat as they passed each other.  (TT III:121:22-122:8).

8

45.     Marion was not aware of any hazards in the channel. (TT
III:127:4-6).

46.     Marion was not relying on File to act as a lookout for
submerged objects at the time of the accident because he had
navigated the channel on numerous occasions. (TT III:206:6-
207:5). Moreover, Marion had substantially the same view of the
channel from the wheelhouse as one would have standing on the
foredeck of the Safari Rose. (TT III:163:12-24).

47.     About halfway through the channel and as the boats were
passing side to side, Marion felt a bump. (TT III:122:16-22).
The bump did not stop the boat, so Marion proceeded to navigate
the boat through the channel. (TT III:123:2-13).

48.     The front of the starboard stabilizer fin impacted the
concrete cap and tore a hole in the Safari Rose. The impact
occurred near the bottom of the stabilizer fin, at its deepest
edge. (TT I:180:7-181:15).

49.     The concrete cap was approximately 2.5 to 5 feet below
the surface of the water. (TT I:186:18-22). The concrete cap
could barely be seen at its shallowest depth of 2.5 feet. (TT
I:168:25-169:2).

50.     The depth of the water over the concrete cap where the
Safari Rose made impact was approximately 4 feet. (TX GG-4).
The concrete cap could not be seen at this depth.

51.     About a third of the way through the outer channel, a
high water alarm went off, indicating high water in the boat's
bilges. (TT III:123:14-25).

52.     Marion sent an off-duty employee who was aboard the boat,
Andrew Morris ("Morris"), below to check on the alarm. (TT

III:124:1-3).  Morris reported water coming through the

floorboards in the staterooms below.  (TT III:124:4-6).

53.      Marion could not turn the boat around in the channel

because the channel was too narrow.  (TT III:124:22-23).

54.      Once the Safari Rose exited the outer channel, Marion

determined that the safest course of action was to take the boat

to the closest beach and ground it there rather than to try to

get the boat back to TKM in heavy traffic.  (TT III:125:15-

126:1).

55.      It took approximately two minutes for the Safari Rose to

reach the beach after it exited the outer channel.  (TT

III:126:10-13).  During those two minutes, Marion felt the boat

begin to "bog down" and become difficult to drive.  (TT

III:126:16-18).  Marion beached the boat on the sand, and it

began to list to starboard.  (TT III:126:20-21).

56.      Marion helped transfer half of the passengers to a small

fishing charter boat.  Then, Marion and the remainder of the

passengers boarded a South Lake Tahoe City Police or El Dorado

County Sheriff's boat to return to TKM.  (TT III:127:20-25).

57.      While returning to TKM, Marion spoke to an officer about

the accident.  The officer told Marion that he must have hit the

concrete cap in the channel.  (TT III:128:11-20).

58.      Marion did not know about the existence of the concrete

cap in the channel before he was informed about it by the

officer.  (TT III:134:21-22).

59.      Marion returned to the Safari Rose later that day in

order to see if it could be salvaged or protected from further

damage.  He spoke to Buttling about the accident and stated that

10

he must have his the concrete cap in the channel. (TT III: 130:12-15; 133:2-15).

60.    The damage to the Safari Rose was caused solely by its impact with the concrete cap and the subsequent flooding.[5]

61.    Caravel purchased the Safari Rose for $260,000. (TT V:53:8-10). Shortly thereafter it was appraised at $350,000 in "as is" condition and at $410,000 after the items of deferred maintenance were completed. (TT V:16:11-14; 53:11-16).

62.    Caravel substantially complied with all of the items of deferred maintenance. (TT V:81:24-82:6).

63.    Caravel invested approximately $615,145.08 in the Safari Rose while it was in Seattle. (TT I:92:2-5).

64.    Neither party definitively established the fair market value of the Safari Rose prior to the accident based upon comparable vessel sales. (TT V:114:7-9).

65.    Based upon the substantial repairs made to the Safari Rose, the cost and risk of transferring the boat from Seattle to Lake Tahoe, and the rarity of the custom built boat, the value of the boat prior to its sinking was between $800,000-$900,000. (TT V:92:13-23).

66.    Plaintiffs paid $1,925 to BJ's Barge Service and $4,230 to H20 Towing, both of which responded to a Mayday call and provided pumps and assistance to the Safari Rose on the day of the sinking. (TT II:28:10-29:16; TX 19-20).

---

[5]    The court does not find credible testimony that there was a "snail trail" leading up to the concrete cap created by the Safari Rose's stabilizer. Moreover, even if a "snail trail" was present, the court finds that it did not cause the accident or subsequent damage to the Safari Rose.

67.     Plaintiffs paid Parker Diving Service $50,530.11 for salvaging the boat from the water.  (TT II:67:20-24; TX 17).

68.     The Safari Rose was lifted from the water by crane, at a cost of $29,425.50, to be repaired.  (TT I:187:4-16; TX 41).

69.     The total cost of repairs completed to date on the Safari Rose is $320,464.54.  (TX 14:1-4).

70.     The estimated cost of the repairs left to be completed is $361,272.18.  (TX 36 at 61-62).

71.     St. Paul declared the Safari Rose a total loss under the insurance policy.  (TT II:90:22-91:8).

72.     Caravel purchased the Safari Rose salvage from St. Paul for $65,000.  (TT II:148:1-6).

73.     Prior to the 2003 season, Caravel incurred advertising costs for the Safari Rose.  (TT II:60:21-62:4).  These costs amount to $6,423.49.  (TX 47).  Caravel also spent $4,500 in wedding promotional packages specific to the Safari Rose for that season.  (TT II:62:5-11).  Because the Safari Rose failed to operate that season, Caravel lost substantially all of the value of that $11,923.49 invested in advertising.

74.     Caravel also lost $41,174 that had already been committed to Caravel by its pre-booked customers.  (TT I:189:23-193:5; TX 51-52).

75.     The actual total net profit lost by Caravel due to the sinking of the Safari Rose and the near total loss of the 2003 season was $68,000.  (TT IV:17:2-6).[6]

/////

---

[6]     Plaintiffs did not sufficiently establish the amount lost on food and beverage items destroyed in the sinking.

12

1

**CONCLUSIONS OF LAW**

2  **A.   Liability**

3          This is an admiralty and maritime case involving damage to a

4  vessel occurring on the navigable waters of the United States

5  over which this court has jurisdiction pursuant to 28 U.S.C. §

6  1333.  Plaintiffs contend that defendant TKM's negligence caused

7  the damage to the Safari Rose, and thus, is liable for damages.

8          It is well established that defendant TKM, as a wharfinger,

9  owed a duty of care to plaintiff Caravel.  <u>Smith v. Burnett</u>, 173

10  U.S. 430, 433 (1899); <u>Grace Line, Inc. v. Todd Shipyards Corp.</u>,

11  500 F.2d 361, 365 (9th Cir. 1974).  A wharfinger has a general

12  duty to "exercise reasonable diligence in ascertaining the

13  conditions of the berths thereat, and if there is any dangerous

14  obstruction to remove it, or to give notice of its existence to

15  vessels about to use the berths."  <u>Id.</u>  This duty to remove or

16  warn of obstructions extends to the "approaches" to those berths.

17  <u>Id.</u> at 436.  Because TKM leased a berth to Caravel, TKM had a

18  duty to remove or warn Caravel of any obstructions in the

19  channel.

20          The obstruction was completely below the surface of the

21  water.  Further, the concrete cap was a hazard to navigation.

22  The following factors are relevant in determining whether an

23  obstruction is a hazard to navigation:

24          (1)  The degree to which the obstruction restricts,
                 endangers, or interferes with the navigability of
25               a body of water
                 (a)  Location with respect to navigational traffic
26                    patterns.
                 (b)  Navigational difficulty at the site of the
27                    obstruction.
                 (c)  Clearance or depth of water over obstruction.

28

13

               (d)  Fluctuation of water level and other
                    hydraulic characteristics.
    (2)  Physical characteristics of the obstruction,
         including cargo (if any exists).
    (3)  Possible movement of the obstruction.
    (4)  Marine activity in the vicinity of the
         obstruction.
               (a)  Type of commercial and recreational vessel
                    traffic.
               (b)  Density of commercial and recreational vessel
                    traffic.
               (c)  Trends of waterway use.
    (5)  Location of obstruction with respect to existing
         aids to navigation.
    (6)  Prevailing and historical weather conditions.
    (7)  Length of time the obstruction has been in
         existence.
    (8)  History of vessel accidents involving the
         obstruction.

Theriot v. United States, 245 F.3d 388, 398 (5th Cir. 1998); see also 33 C.F.R. § 64.31 (listing similar factors that the District Commander considers in determining whether an obstruction is a hazard).  The concrete cap was located in a navigational channel, where boat traffic was not only expected, but compelled because the channel was the only way in and out of the busy marina.  But for the submerged concrete, mariners could safely assume they could easily cruise in and out of the straight, dredged channel that was devoted to the purpose of boat traffic.  Voluminous boat traffic of all types, commercial and recreational, was normal and expected, especially during the summer.  The depth of the water over the concrete about 15 feet from the bulkhead was about four feet on the date of the accident, while TKM knew that boats, including the Safari Rose, with greater drafts had to navigate the channel.  Due to the changing water levels in the channel, the concrete was constantly changing in terms of the threat it posed to boats of various drafts.  This made the concrete especially dangerous.  The concrete cap was submerged and

1   difficult to see, even if one was aware of it and tried to
2   identify it.   TKM failed to post any aids to navigation, such as
3   signs or buoys, to warn of the concrete.   Furthermore, buoys in
4   the outer channel demarcated where mariners could safely
5   navigate, and the absence of such markers indicated the inner
6   channel was safe throughout.   TKM knew about the concrete for
7   years, and was on notice that rental boats were hitting it, yet
8   did nothing to fix the problem.   Thus, the concrete cap
9   obstruction was a hazard to navigation.

10      Permitting a hidden, submerged obstruction to remain in a
11  navigable channel without marking its presence is negligence.
12  See Casement v. Brown, 148 U.S. 615, 623-624 (1893); Corby v.
13  Ramsdell, 48 F.2d 701, 703 (2d Cir. 1931); Williams v. Edward
14  Gillen Dock, Dredge & Const. Co., 258 F. 591, 593 (6th Cir.
15  1919); Red Star Towing & Transp. Co. v. Snare & Triest Co., 194
16  F. 672, 673 (2d Cir. 1912); Marine Contracting and Towing Co. v.
17  McMeekin Construction Co., 302 F. Supp. 804, 808 (D.S.C. 1969)
18  (citing Whorton v. T. A. Loving & Company, 344 F.2d 739, 746 (4th
19  Cir. 1965).   TKM was negligent because, although it was aware of
20  the concrete prior to the accident, it failed to inspect the
21  concrete to determine its size and depth, failed to remove the
22  concrete prior to the accident, failed to mark the concrete, and
23  failed to warn of the concrete.   TKM's negligence was the sole
24  cause of the accident and sinking of the Safari Rose.

25      Defendant TKM contends that it is not responsible for the
26  accident and subsequent damages pursuant to The Oregon rule
27  because the concrete cap was an open and obvious condition and
28  because Marion knew about the concrete cap before the accident.

15

1  The Oregon presumption holds that when a vessel collides with a
2  stationary object, the vessel is presumed to be at fault.   The
3  Oregon, 158 U.S. 186, 192-93 (1895).  However, The Oregon
4  presumption does not apply to hidden submerged objects.  See
5  Delta Transload, Inc. v. Motor Vessel "Navios Commander", 818
6  F.2d 445, 450 (5th Cir. 1987) (the presumption does not apply to
7  allisions with sunken or hidden objects); Pelican Marine
8  Carriers, Inc. v. City of Tampa, 791 F. Supp. 845, 852 (M.D. Fla.
9  1992) (same); (Order [Docket #69], filed June 30, 2006, at 19).
10 Based upon the evidence presented at trial, the court found that
11 the concrete cap was not visible where the Safari Rose made
12 impact and that Marion did not know of the existence of the
13 concrete cap prior to the accident.  Thus, The Oregon presumption
14 does not apply to the facts of this case.

15        Defendant TKM also contends that the concrete cap was not
16 the sole cause of the accident because Caravel or the captain of
17 its ship breached applicable statutory rules.  Under The
18 Pennsylvania rule, a ship that violates a statutory rule intended
19 to prevent collisions is presumed to be the contributing, if not
20 the sole, cause of the incident.  The Pennsylvania, 86 U.S. 125,
21 136 (1873), overruled on other grounds by United States v.
22 Reliable Transfer Co., 421 U.S. 397, 411 (1975); Trinidad Corp.
23 v. S.S. Keiyoh Maru, 845 F.2d 818, 824 (9th Cir. 1989) (The
24 Pennsylvania rule applies in Ninth Circuit).  If the defendant
25 establishes that the plaintiff violated any statutory rule, The
26 Pennsylvania presumption shifts the burden of proof to the
27 plaintiff to prove that "the violation could not reasonably be
28 held to have been a proximate cause of the collision."  Trinidad

Corp., 845 F.2d at 824 (quoting States S.S. Co. v. Permanente

S.S. Corp., 231 F.2d 82, 87 (9th Cir. 1956)). To rebut the

presumption, the plaintiff must prove not merely that its "fault

might not have been one of the causes of the collision but that

it could not have been one of the causes." Id., 845 F.2d at 824.

     First, defendant claims that The Safari Rose was in

violation of the Lookout Rule by failing to maintain a proper

lookout on the boat to warn of possible collisions.   The Lookout

Rule provides:

          Every vessel shall at all times maintain a proper
          look-out by sight and hearing as well as by all
          available means appropriate in the prevailing
          circumstances and conditions so as to make a full
          appraisal of the situation and of the risk of
          collision.

33 U.S.C. § 2005 (West 2005).  Failure to post an appropriate

lookout is a statutory violation triggering The Pennsylvania

rule. First Nat'l Bank of Chicago v. Material Serv. Corp., 544

F.2d 911, 918 (7th Cir. 1976).  The Ninth Circuit has held that a

captain may properly serve as the lookout where he has

substantially the same view from the wheelhouse as the from the

bow. Marport, Inc. v. Stabbert and Assocs., Inc., 771 F.2d 1216,

1218 (9th Cir. 1985); see Anthony v.Int'l Paper Co., 289 F.2d

574, 580 (4th Cir. 1961) (holding that the size of the vessel and

the opportunity of the navigator to have full view of the seas

should be taken into consideration in determining the need for a

separate and independent lookout); Illinois Constructors Corp. v.

Logan Transp., Inc., 715 F. Supp. 872, 883 (N.D. Ill. 1989)

("[U]nder appropriate circumstances, a captain or pilot of a

towboat may serve as a lookout, and an addition lookout on the

17

bow of the tow is not necessary unless required to enhance safety.").

On the day of the accident, Captain Marion had substantially the same view of the channel from the wheelhouse as one would have standing on the foredeck of the Safari Rose.  Therefore, a second lookout was not required and The Pennsylvania presumption does not apply.  However, even if a second lookout was required, the absence thereof did not cause or contribute to the accident because, as set forth above, the concrete cap was not visible from the bow of the Safari Rose at the point of impact.  See Texas Eastern Transmission Corp. v. Tug Captain Dann, 898 F. Supp. 198, 207 (S.D.N.Y. 1995) (stating that "[a] look out's failure to see an underwater obstruction is not negligence" and holding that despite the failure to post a proper lookout, the vessel was not liable because the submerged object was not visible at the time of the allision) (citing Am. Zinc Co. v. Foster, 313 F. Supp. 671 (S.D. Miss. 1970); M/S Bell Dan, 1967 A.M.C. 2295, 2304 (1967); Cumberland County Utilities Auth. v. M/T Delbar, 604 F. Supp. 383 (D.N.J. 1985).  Therefore, even if The Pennsylvania presumption applied based upon the failure to post a second lookout at the bow of the Safari Rose, plaintiffs have successfully rebutted the presumption by demonstrating that the failure to do so did not cause the accident.

Second, defendant TKM contends that the Safari Rose was in violation of the Narrow Channel Rule because it gave way to the passing sailboat in the channel.  Defendant asserts that Marion should have signaled the sailboat that the Safari Rose was maintaining its course because it needed to stay close to the

18

center of the channel.  The Narrow Channel Rule provides, in

relevant part:

> A vessel proceeding along the course of a narrow
> channel or fairway shall keep as near to the outer
> limit of the channel or fairway which lies on her
> starboard side as is safe and practicable. . . . A
> vessel of less than 20 meters in length or a sailing
> vessel shall not impede the passage of a vessel that
> can safely navigate only within a narrow channel or
> fairway.

33 U.S.C. § 2009 (West 2007).  As such, the Narrow Channel Rule

requires that a vessel keep as near to the starboard side as is

"safe and practicable."  Id.

The evidence presented at trial does not demonstrate that

the Safari Rose violated the Narrow Channel Rule.  Marion

navigated the ship to the starboard side of the channel to let

the sailboat pass.  This navigation would have been "safe and

practicable" if not for the submerged concrete cap that was not

known to Marion or visible at the time of impact.  As such,

because Marion was in compliance with the Narrow Channel Rule,

The Pennsylvania presumption does not apply to Marion's

navigation of the Safari Rose to the right of the channel.

Finally, defendant contends that the Safari Rose was in

violation of the Prudent Mariner Rule by failing to investigate

the channel prior to its operation.  The Prudent Mariner Rule

establishes a general duty on all mariners to use prudent

seamanship.  Specifically, the Prudent Mariner Rule provides, in

relevant part:

> Nothing in these Rules [33 U.S.C.S. §§ 2001 et seq.]
> shall exonerate any vessel, or the owner, master, or
> crew thereof, from the consequences of any neglect to
> comply with these Rules or of the neglect of any
> precaution which may be required by the ordinary

19

1    practice of seamen, or by the special circumstances of
2    the case.

3    33 U.S.C. § 2002(a) (West 2007).

4         Defendant fails to cite any authority to support its
5    assertion that Caravel or Marion violated the Prudent Mariner
6    Rule by failing to conduct an independent investigation of the
7    channel.  Rather, the testimony at trial demonstrated that Dunham
8    asked Carreau whether the Safari Rose could safely operate out of
9    TKM and whether there was anything in the channel that he should
10   know about.  Carreau responded that there was nine feet of water
11   in the channel.  Based upon the evidence presented to the court
12   and the legal authority submitted by the parties, there is no
13   basis for this court to hold that plaintiffs violated the Prudent
14   Mariner Rule.  Thus, <u>The Pennsylvania</u> presumption does not apply
15   to the facts of this case.[7]

16        Therefore, defendant TKM was negligent in failing (1) to
17   inspect the concrete to determine its size and depth; (2) to
18   remove the concrete cap prior to the accident; (3) to mark the
19   concrete cap; and/or (4) to warn mariners of the concrete.  TKM's
20   negligence was the sole cause of the accident and sinking of the
21   Safari Rose.

22   /////

23

24        [7]   Defendant TKM also argues that the Safari Rose would
25   not have sunk but for the presence of the starboard stabilizer
     defendant warned Caravel to remove.  However, defendant never
26   warned Caravel that the stabilizer might hit the concrete cap in
     the channel or that the Safari Rose could not navigate the
27   channel with the stabilizer.  Moreover, defendant cites no
     authority for escaping or limiting liability based upon the
28   presence of the starboard stabilizer.  As such, this argument is
     without merit.

                              20

**B.   Damages**

The measure of damages for the total loss of a vessel in a collision at sea is "the market value of the lost ship, if it has a market value at the time of destruction." Oliver J. Olson & Co. v. Am. Steamship Marine Leopard, 356 F.2d 728, 733 (9th Cir. 1966) (citing Standard Oil Co. v. So. Pac. Co., 268 U.S. 146, 155-56 (1925). A vessel is considered a constructive total loss when the cost of salvage and repairs is greater than the fair market value immediately prior to the accident. Tidewater Marine, Inc. v. Sanco Int'l, Inc., 113 F. Supp. 2d 987, 1005 (E.D. La. 2000). If the vessel was not a total loss, "then the measure of damages is the reasonable expense of raising and repairing [it] to an extent sufficient to put [it] in as good condition as [it] was before the collision." O'Brien Bros. v. The Helen B. Moran, 160 F.2d 502, 504 (2d Cir. 1947); see Stevens v. F/V Bonnie Doon, 731 F.2d 1433, 1436 (9th Cir. 1984). This measure of damages also includes any profits lost during the time it takes to effect the repairs, costs of survey, towing to dry-dock, dry-docking, and any similar costs required to fully restore a plaintiff. See id.; The Catalina, 18 F. Supp. 461, 468 (S.D. Cal. 1937). It is the plaintiff's burden to prove damages. Id.; Tidewater Marine, 113 F. Supp. 2d at 1005.

A prima facie case for damages may be established by the plaintiff with proof of repair costs. Tidewater Marine, 113 F. Supp. 2d at 1005 (citing O'Brien, 160 F.2d at 505). However, if the defendant demonstrates that the total value of the vessel is less than the cost of repairs, "the plaintiff must rebut that evidence with proof of a higher market value, or else recovery

may be limited." Id. "As a general rule, market value should be established by evidence of contemporaneous sales of like vessels." Id. (citing Standard Oil, 268 U.S. at 155-56). Where there is no market value based upon contemporaneous sales, the value of the vessel "may be taken to be the sum which, considering all the circumstances, probably could have been obtained for [it] on the date of the collision." Standard Oil, 286 U.S. at 155. The ascertainment of value "is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." Id. at 156.

Plaintiffs satisfied their prima facie burden of demonstrating repair costs. The court finds that the evidence presented at trial reveals that the total cost of repair of the Safari Rose, including incurred costs ($320,464.54) and estimated future costs ($361,272.18), is $681,736.72. Plaintiffs also expended $86,110.61 in total to pump the boat on the day of the accident, to salvage the boat, and to lift the boat out of the water by crane.

Defendant TKM was unable to establish the fair market value of the Safari Rose at the time of the accident. Defendant attempted to rely upon the original assessment performed in Seattle prior to Caravel's 2002-2003 restoration and upgrade of the boat. Defendant failed to proffer any evidence of contemporaneous sales of like vessels at the time of the accident. Defendant also failed to introduce evidence of values for boats that were at Lake Tahoe and suitable for use as passenger vessels accommodating weddings, corporate cruises, and

1   other similar events.  In contrast, plaintiffs presented credible
2   evidence that, taking into account the substantial repairs to the
3   boat, its location at Lake Tahoe, its ability to carry passengers
4   and accommodate events, and its custom built and unique nature,
5   the value of the boat was approximately between $800,000-
6   $900,000.  Assuming that the value is closer to $800,000, the
7   cost of repairs to the boat was at least $100,000 less than its
8   value prior to the accident.  Even if the court considers the
9   costs to pump, salvage, and lift the boat out of the water, the
10  total cost is still at least $30,000 less than its prior value.
11  Thus, the Safari Rose was not a constructive total loss, and
12  plaintiffs' damages are not limited.  See Tidewater Marine, 113
13  F. Supp. 2d at 1006; see Ryan Walsh Stevedoring Co., Inc. v.
14  James Marine Servs. Inc., 792 F.2d 489, 491 (5th Cir. 1986)).

15      The reasonable cost of repair to the Safari Rose is
16  $681,736.72.  Plaintiffs also expended $86,110.61 in costs
17  related to the sinking and subsequent repair of the Safari Rose.
18  Moreover, plaintiffs lost $11,923.49 in advertising costs and
19  $68,000 in profit.  Thus, recoverable damages total $847,770.82.
20      Plaintiffs also seek prejudgment interest for all damages.
21  "[P]rejudgment interest should be awarded in maritime collision
22  cases, subject to a limited exception for 'peculiar' or
23  'exceptional' circumstances."  City of Milwaukee v. Cement Div.,
24  Nat'l Gypsum Co., 515 U.S. 189, 195 (1995).  A district court has
25  broad discretion in determining the date from which prejudgment
26  interest should run.  Columbia Brick Works, Inc. v. Royal Ins.
27  Co. of Am., 768 F.2d 1066, 1068 (9th Cir. 1985); United States v.
28  Peavey Barge Line, 748 F.2d 395, 402 (7th Cir. 1984) (citing

                                  23

1  Indep. Bulk Transp., Inc. v. The Vessel "Morania Abaco", 676 F.2d

2  23, 25 (2d Cir. 1982)).   Generally, prejudgment interest is

3  awarded from the date of the collision in order to compensate the

4  plaintiff in full.  Id. (citations omitted).   However,

5  "prejudgment interest on money not spent is inappropriate when

6  the injured party recovers for loss of use."  Stevens, 731 F.2d

7  at 1437; see Peavey Barge Line, 748 F.2d at 402 ("[P]rejudgment

8  interest should not be awarded before the injured party pays for

9  the repairs if damages include both demurrage costs and repair

10 costs").

11      This is not a "peculiar" or "exceptional" case; therefore,

12 the award of prejudgment interest to plaintiffs is appropriate.

13 As set forth above, the court awarded damages for lost profits.

14 This award is for lost profits through October 31, 2003, the end

15 of the 2003 season for the Safari Rose.  (See TT IV:16:10-15).

16 As of that date, the owners of the Safari Rose had incurred

17 substantial repair costs.   However, there is no evidence that

18 plaintiffs have incurred the costs of the estimated future

19 repairs in the amount of $361,272.18.   It would be inappropriate

20 for the court to award prejudgment interest for those costs not

21 yet incurred.   Therefore, the court awards prejudgment interest

22 on the amount of $486,498.64 at the applicable federal rate

23 starting November 1, 2003.[8]

24 /////

25

26      [8]   Plaintiffs assert that the applicable rates in effect
   as of November 1, 2003 was 1.30%, then 2.27% on November 1, 2004,
27 4.26% on November 1, 2005, 5.07% on November 1, 2006, and 3.97%
   as of November 1, 2007.  Defendant asserts no argument or
28 analysis with respect to prejudgment interest.

**CONCLUSION**

For the foregoing reasons, plaintiffs have demonstrated that defendant TKM was negligent and that such negligence was the sole cause of the accident and subsequent damages to the Safari Rose. Moreover, plaintiffs have demonstrated damages in the total amount of $847,770.82.  Prejudgment interest is awarded on the amount of $486,498.64 at the applicable federal rate starting November 1, 2003.  Plaintiffs shall recover costs of suit.

The Clerk of the Court is directed to close this file.

IT IS SO ORDERED.

DATED: January 7, 2008

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

25